**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

IN RE:

NUTS & BOLTZS, LLC,

Debtor(s).

C/A No. 09-09615-DD

Chapter 11

**ORDER**

THIS MATTER is before the Court on Nuts & Boltzs, LLC's ("Debtor") Motion

to Establish Value ("Motion"). An objection to Debtor's Motion was filed by True Value

Company ("True Value") on May 28, 2010. Pursuant to Federal Rule of Civil Procedure

52, which is made applicable to this contested matter by Federal Rules of Bankruptcy

Procedure 7052 and 9014(c), the Court makes the following findings of fact and

conclusions of law.

*FINDINGS OF FACT*

At the hearing conducted in this matter, the parties stipulated to the following:

1.  This case was commenced upon the filing of a voluntary Petition for
    Relief by the Debtor on December 28, 2009. The Debtor serves as
    Debtor in Possession.

2.  The Debtor's personal assets are subject to various recorded liens as
    follows: CIT Small Business Lending Corporation ("CIT"), by UCC
    recorded December 20, 2006, which describes the Collateral as all
    assets of the Debtor; Crull Family Associates, LLC, by UCC recorded
    December 26, 2006, which describes the Collateral as furniture,
    fixtures, inventory and assets of the Debtor; and True Value, by UCC
    recorded February 1, 2007, which describes the Collateral as inclusive
    of inventory along with private branded equipment, furniture, fixtures,
    equipment and other personal property owned by the Debtor, as well
    as accounts and receivables arising from the sale or lease of
    Inventory.[1]

---

[1] Carolina First Bank also filed UCC financing statements. The Court previously ruled that the claim of
Carolina First is unsecured.

3. In addition to the stated liens, CIT has a first and only mortgage on the Debtor's real property on Wappoo Road, in Charleston, South Carolina.

4. CIT has filed a proof of claim in this case in the amount of $1,180,359.58, and listed the claim as secured by Value of Property at $1,200,000.00.

5. True Value has filed a proof of claim, and an amended proof of claim, in the amount of $537,248.24, and listed the claim as secured but did not specify a value of property.

6. Crull Family Associates, LLC has not filed a proof of claim in this case, its claim is listed on the Debtor's Schedule D as $0.00, although the original claim amount was $130,000.00.[2]

7. By virtue of the recordation dates of UCCs, the lien of True Value has a third priority status, behind the paramount lien of CIT, and the secondary lien of Crull Family Associates, LLC.

8. According to the Debtor's Schedule B, the value of the personal property of the Debtor is $399,480.00.  The value of the real property as shown on the Debtor's Schedule A is $700,000.00.  The combined total of these assets is $1,099,480.  The breakdown on Schedule B of the various groups of personal property is as follows (as of the Petition date):  Cash and accounts, $2,800.00; Accounts Receivable, $27,000.00; FF&E, $8,200.00; and Inventory, $361,480 at cost.

9. Since the filing date of this case, the Debtor's inventory base has remained relatively stable and in accord with the Schedule B amount.

10. The current value of the Debtor's real estate has declined somewhat in the present economy, on information and belief.  For purposes of this matter, the Debtor will be using the Schedule A amount of $700,000.00, which is also the value on the records of the Charleston County Treasurer. (The Stipulation added, "The Debtor reserves the right to amend the valuation of real estate as appropriate.")

The parties further agreed and stipulated that the value of Debtor's real estate for the

purposes of this hearing is $700,000.00 and that the claim held by Crull Family

---

[2] The UCC lien remains open at the South Carolina Secretary of State's Office, and has not been terminated as of the date of Debtor's Motion.

2

Associates would not be treated as secured and would not have priority over the True

Value lien.

True Value contends that the monthly operating reports filed by the Debtor in this

case for the months of January, February, March and April 2010, reflect the normal

business operations of this Debtor in Possession. These monthly operating reports

include total sales receipts for each month and total inventory purchases made by the

Debtor for each month. In this four month period, the Debtor had total sales of

$392,578.00. During that same time, the Debtor paid $225,026.00 to replenish inventory

which had been sold. Based on these numbers provided by the Debtor, True Value

argues that 57.3% of the total sales is attributed to the cost of goods. True Value

contends that the Debtor's inventory, which costs $361,500.00, has a retail value of

$630,890.00. (A 42.7% markup.)

Michael Metts, the owner and operator of the Debtor, testified at the hearing that

the markup on items sold by the Debtor averages approximately 33%. Markup, as used

in the retail context, represents the suggested retail value of a particular item of inventory

above the cost of that item. Mr. Metts testified that while sometimes the markup on an

item is greater than 33%, the markup is often less than 33% depending on the amount of

time an item has remained in inventory.

### *CONCLUSIONS OF LAW*

The Debtor and True Value seek a determination of the value of the Debtor's

inventory. The Debtor argues inventory should be valued for the purposes of 11 U.S.C.

§ 506[3] at the replacement cost to the Debtor. True Value contends that the proper value

---

[3] Further reference to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, shall be by section number only.

under § 506 is the sales or retail value.  If the inventory is valued at the replacement cost,

True Value has no lien on the inventory since CIT's superior lien consumes the value.

> The Bankruptcy Code provides:

> An allowed claim of a creditor secured by a lien on property in which the
> estate has an interest, or that is subject to setoff under section 553 of this
> title, is a secured claim to the extent of the value of such creditor's interest
> in the estate's interest in such property, or to the extent of the amount
> subject to setoff, as the case may be, and is an unsecured claim to the
> extent that the value of such creditor's interest or the amount so subject to
> setoff is less than the amount of such allowed claim.  Such value shall be
> determined in light of the purpose of the valuation and of the proposed
> disposition or use of such property, and in conjunction with any hearing
> on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1).  Section 506 is thus a mechanism for splitting a single

undersecured claim into two parts based upon the court's valuation of the collateral and

the creditor's claim.  *See, In re Coates*, 180 B.R. 110 (Bankr. D.S.C. 1995).  The

Supreme Court has interpreted what is now § 506(a)(1)[4] to provide:

> [A] secured creditor's claim is to be divided into secured and unsecured
> portions, with the secured portion limited to the value of the collateral.
> To separate the secured from the unsecured portion of a claim, a court
> must compare the creditor's claim to the value of 'such property,' i.e., the
> collateral.  That comparison is sometimes complicated.  A debtor may
> own only a part interest in the property pledged as collateral, in which case
> the court will be required to ascertain the 'estate's interest' in the
> collateral.  Or, a creditor may hold a junior or subordinate lien, which
> would require the court to ascertain the creditor's interest in the collateral.

*Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 961 (1997) (citations omitted).

In *Rash*, the Supreme Court held that the valuation of collateral is to be

determined in light of the purpose of the valuation and of the proposed disposition or use

of the collateral.  *Id.* at 962.  *Rash* addressed a chapter 13 debtor that sought to retain a

tractor truck and cram down his chapter 13 plan over the secured creditor's objection.

---

[4] At the time of *Rash*, the current § 506(a)(1) was § 506(a).

4

There the Supreme Court held that replacement value, measured by the price a willing

buyer would pay in the debtor's business or situation, is appropriate for valuation.  In

other words, the Supreme Court applied a retail valuation.  Although *Rash* arose in the

context of a chapter 13 case, its application in chapter 11 cases is not disputed.  *See, In re*

*Preventive Maintenance Services, Inc.,* 359 B.R. 607, 610 (Bankr. W.D. La. 2007); *See*

*also, Financial Sec. Assur. v. T-H New Orleans Ltd. Pshp. (In re T-H New Orleans Ltd.*

*Pshp)*, 116 F.3d 790, 799 (5th Cir. 1997).

In the context of an individual chapter 7 or chapter 13 case, the Bankruptcy Code

was amended in 2005 to include § 506(a)(2), which provides in part that the value of

personal property held for personal, family or household uses is to be determined using

"replacement value," defined as the price that a retail merchant would charge for property

of the kind considering the age and condition of the property as of the petition date

without deduction for costs of sale or marketing.  This amendment to the Bankruptcy

Code codifies the result in *Rash* for consumer chapter 7 and 13 cases.

True Value argues that the legislative purpose in codifying *Rash* was to require a

retail valuation in all instances.  However, in this amendment to the Bankruptcy Code

Congress spoke only to chapter 7 and 13 cases.  In the chapter 11 context, the

amendments to § 506 are silent as to the method of valuation.  Importantly for the issue at

hand, the Supreme Court noted in a footnote 6 to *Rash* that, "[w]hether replacement value

is the equivalent of retail value, wholesale value, or some other value will depend on the

type of debtor and the nature of the property." *Rash*, 520 U.S. at 965.

In the context of a chapter 11 retail merchant with inventory under lien, the

replacement cost is generally the wholesale cost.  The testimony of Debtor's principal

was to the effect that it regularly replaces its inventory by making wholesale purchases of

inventory.  Replacement cost for a consumer in a chapter 7 or 13 is the price the debtor

would pay for replacement, i.e. paying retail to a seller of goods.  The replacement cost of

the goods for the merchant is the price the merchant would pay for replacement, i.e.

wholesale paid to a distributor.  This does not leave True Value without an interest in the

proceeds from the inventory as it is sold.[5]  Under Article 9 of the Uniform Commercial

Code, as adopted in South Carolina, the security interest of True Value attaches to

"proceeds of collateral."  S.C. Code Ann. § 36-9-315(a)(2).  In this fashion, True Value's

lien on all inventory of the Debtor extends to the revenue produced by the Debtor's

hardware sales.

The Fourth Circuit addressed valuation issues prior to *Rash*.  *See, Ford Motor*

*Credit Co. v. Dobbins*, 35 F.3d 860 (4th Cir. 1994) (holding that when secured collateral

has been sold, so long as the sale price is fair and is the result of an arm's-length

transaction, courts should use the sale price, and not some earlier hypothetical valuation,

to determine whether a creditor is oversecured in the context of § 506(b)); *In re Coker*,

973 F.2d 258 (4th Cir. 1992) (finding that hypothetical costs of sale should not be

deducted in a valuation); *In re Balbus*, 933 F.2d 246 (4th Cir. 1991) (holding that

hypothetical costs of sale should not be deducted when the purpose of the valuation is to

determine jurisdictional eligibility for chapter 13).  These opinions are consistent with

*Rash* in as much as they focus on the purpose of the valuation and proposed disposition

or use.  *See, Balbus*, 933 F.2d at 251.  These cases, however, do not extend the valuation

---

[5] The Court earlier permitted the use of cash collateral and provided for protection of the interests of lien
holders to the extent that the value of collateral is diminished by such use.

analysis to encompass the debtor's cost of replacing the goods as is required by the

Supreme Court in *Rash.*

In this case, as in *Rash*, the Debtor seeks to use the collateral to continue a

business as a going concern.  However, unlike in *Rash* here the replacement value that

the Debtor would pay to restock inventory is a wholesale cost rather than retail sales

price.  *Rash* instructs the Court to approach valuation from the debtor's perspective where

the debtor retains use of the collateral.  The fact that the Debtor intends to sell the

inventory does not dictate a retail valuation.  The Debtor in this case can, and in fact

does, replace the inventory at wholesale.  The replacement value of a retailer's inventory

is the wholesale cost.  Therefore, the value of Debtor's inventory for purposes of

determining the extent of True Value's lien is $361,480.

## *CONCLUSION*

The proof of claim filed by CIT establishes a claim of $1,180,359.58.  When

applied against the combined total of the Debtor's assets a shortfall remains totaling

$80,879.50.  For the reasons detailed above, the junior lien on inventory held by True

Value is valued at zero, and the entire amount of True Value's claim is deemed

unsecured.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**07/02/2010**



SuXR Du

David R. Duncan
US Bankruptcy Judge
District of South Carolina